**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

WILLIE MACON,

Plaintiff,

vs. CASE NO.:

TBN GOLF FEDERAL LLC
Florida Limited Liability Company
d/b/a SMITH'S AMERICAN
TAVERN

INJUNCTIVE RELIEF SOUGHT

Defendant(s).

# COMPLAINT

Plaintiff, WILLIE MACON (hereinafter "MACON"), by and through the undersigned counsel, hereby files this Complaint and sues TBN GOLF FEDERAL LLC, Florida Limited Liability Company, d/b/a SMITH'S AMERICAN TAVERN ("Defendant"), for declaratory and injunctive relief pursuant to 28 U.S.C. §§2201 and 2202, attorneys' fees, litigation expenses, costs (including, but not limited to, court costs and expert fees) for unlawful disability discrimination pursuant to Title III of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12181-12189 ("ADA"), and the regulations implementing the ADA set forth in 28 C.F.R. Part 36, et seq, and alleges as follows:

1. This action arises from Defendant's failure to make Defendant's online platform located at www.smithsamericantavern.com (hereinafter "Defendant's Website") compatible with screen access software, thereby denying blind individuals, including MACON, full and equal access to Defendant's products and services.

2. MACON files this lawsuit because Defendant's policies exclude him, and millions of other potential consumers, from fully and equally enjoying Defendant's products and services.

3. Accordingly, MACON seeks an order requiring that Defendant make Defendant's Website accessible and adopt sufficient policies and practices to ensure the Defendant's Website does not become inaccessible again in the future.

## JURISDICTION AND VENUE

4. This Court is vested with original jurisdiction over this action pursuant to 28 U.S.C. § 1331 and to 28 U.S.C. §1343 for Plaintiff's claims arising under Title 42 U.S.C. §§ 12181-12189, based on Defendant's violations of Title III of the ADA. See also 28 U.S.C. §§ 2201, 2202, as well as the 2010 ADA Standards.

5. Venue is proper in this Court, Tampa Division, pursuant to 28 U.S.C. § 1391(b) and Internal Operating Procedures for the United States District Court of

the Middle District of Florida in that a substantial part of the acts and omissions giving rise to MACON's claims occurred in Polk County, Florida.

6. Defendant attempts to and indeed does, participate in Polk County's economic life by offering and providing products and services over the internet to Polk County's residents, but also extends its services to other residents within the state of Florida through its online presence, including MACON, who is a resident of Orange County, Florida. Defendant purposefully avails itself of the benefits and advantages of operating an interactive, online business open 24-hours a day, 7-days a week, 365-days a year to Florida residents. Indeed, upon information and belief, Defendant places cookies on computers and other electronic devices physically located throughout Florida every time a Florida resident visits Defendant's Website.

7. Further, Defendant operates a Principal Place of Business with a physical address of 124 S Tennessee Ave, Lakeland, FL 33801 (hereinafter "Defendant's Principal Place of Business"), which is located in Polk County, Florida.

8. MACON was injured when he attempted to access Defendant's Website and encountered communication barriers that denied him full and equal access to Defendant's online products, content, services, and other information that Defendant is interested in communicating/offering to its customers.

## PARTIES

9. MACON is a natural person over the age of 18 and is blind.

10. MACON is *sui juris* and is a resident of the State of Florida residing in Orlando, Florida, located in Orange County.

11. MACON is disabled as defined by the ADA and is therefore a member of a protected class under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12102(2), and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 et seq. More specifically, MACON is legally blind from Traction Retinal Detachment, Neovascular Glaucoma, and other ocular complications caused by Diabetes Type I, and therefore is substantially limited in performing one or more major life activities, including but not limited to accurately visualizing his world. As a result of his visual impairment, MACON uses screen access software to access digital content, like text messages, emails, and websites.

12. MACON cannot use his computer without the assistance of appropriate and available auxiliary aids, screen reader software, and other technology and assistance. Screen reader software translates the visual internet into an auditory equivalent. At a rapid pace, the software reads the content of a webpage to the user. As explained in the Eastern District of New York holding of *Andrews v. Blick Art Materials, LLC*:

> The screen reading software uses auditory cues to allow a visually impaired user to effectively use websites. For example, when using

> the visual internet, a seeing user learns that a link may be 'clicked,' which will bring him to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an arrow symbol to a hand. The screen reading software uses auditory -- rather than visual -- cues to relay this same information. When a sight impaired individual reaches a link that may be 'clicked on,' the software reads the link to the user, and after reading the text of the link says the word 'clickable.'...Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a website by listening and responding with his keyboard.

*Andrews v. Blick Art Materials, LLC*, 286 F.Supp.3d 365, 374 (E.D.N.Y.2017).

13. MACON's blindness limits him in the performance of major life activities, including sight, and he requires assistive technologies, auxiliary aids, and services for effective communication, including communication in connection with his use of a computer.

14. MACON frequently accesses the internet. Due to blindness, to effectively communicate and comprehend information available on the internet and thereby access and comprehend websites, MACON uses commercially available screen reader software to interface with the various websites.

15. Defendant is a Florida Limited Liability Company with a principal place of business of 124 S Tennessee Ave, Lakeland, FL 33801 (hereinafter "Defendant's Principal Place of Business").

16. Defendant operates a restaurant and bar offering American tavern fare, including wings, pasta, egg rolls, brunch, and alcoholic beverages, at Defendant's

Principal Place of Business. Defendant also provides golf and multisport game simulators available for hourly reservation. Defendant's Website allows consumers to view menus, make dining reservations, reserve game simulators, review simulator pricing and party packages, obtain location information and directions, and sign up to receive updates and specials by email.

17. Defendant owns, operates, maintains, and/or controls Defendant's Website and is responsible for the policies, practices, and procedures concerning Defendant's Website development and maintenance.

18. Defendant's Principal Place of Business is also open to the public. As such, it is a Place of Public Accommodation subject to the requirements of Title III of the ADA and its implementing regulations as defined by 42 U.S.C. §12181(7)(B), §12182, and 28 C.F.R. §36.104(2). Defendant's Principal Place of Business is also referenced as a "place of public accommodation."

19. Defendant operates its physical restaurant and bar at Defendant's Principal Place of Business and maintains Defendant's Website as a digital extension of that establishment. Defendant owns, controls, and operates Defendant's Website in direct connection with its physical business. Defendant's Website is available to consumers nationwide and allows them to view food, beverage, brunch, and children's menus; review happy hour specials; make dining reservations; book club tickets, reserve golf and multisport game simulators by the

hour; review simulator pricing and party packages; obtain the physical address, operating hours, telephone number, and directions; and register for email updates and specials. These functions provide consumers with access to the dining, beverage, and entertainment services available at Defendant's Principal Place of Business. Defendant's Website serves as a gateway to Defendant's brick-and-mortar business, creating a sufficient nexus between Defendant's Website and Defendant's place of public accommodation.

20. At all times material hereto, Defendant was and still is an organization owning, operating, and/or controlling Defendant's Website. Since Defendant's Website is open to the public through the internet, by this nexus Defendant's Website is an intangible service, privilege, and advantage of Defendant's Principal Place of Business that must comply with all requirements of the ADA, must not discriminate against individuals with visual disabilities, and must not deny those individuals the same full and equal access to and enjoyment of the goods, services, privileges, and advantages as are afforded the non-visually disabled public both online and in the Principal Place of Business. As such, Defendant has subjected itself and Defendant's Website to the requirements of the ADA.

## FACTUAL AND SUBSTANTIVE ALLEGATIONS

21. MACON is and has been a customer who is interested in patronizing and intends to patronize in the near future, once Defendant's Website's access barriers are removed or remedied, Defendant's Principal Place of Business.

22. During MACON's Website Visits, MACON attempted to use Defendant's Website to browse Defendant's food and beverage offerings and online specials in preparation for making a purchase at Defendant's Principal Place of Business, the same functions available to non-disabled customers through Defendant's Website. Specifically, Defendant's menu is present only as images of text with empty alternative-text attributes, MACON's screen reader software skipped the the menu entirely and announced none of Defendant's menu items, descriptions, or prices; and Defendant's logo link is labeled with broken, entity-encoded text ("Smith's American Tavern"), so the business name was not announced correctly. These barriers prevented MACON from independently reviewing Defendant's food and beverage offerings and prices using his screen reader software. Defendant's failure to make these functions accessible to MACON's screen reader software denied MACON the same access to Defendant's goods that Defendant's Website provides to non-disabled customers.

23. Defendant's Website is additionally used to search for brick-and-mortar location, check Defendant's hours, pricing, offerings, and sign up for electronic mailers to receive offers, benefits, exclusive invitations, and

discounts for use at Defendant's Website or in Defendant's Principal Place of Business.

24. The opportunity to shop and pre-shop Defendant's offerings available for purchase at Defendant's Principal Place of Business and sign up for electronic mailers to receive offers, benefits, exclusive invitations, and discounts for use at Defendant's Principal Place of Business from his home are important accommodations for MACON because traveling outside of his home as a visually disabled individual is often a difficult, hazardous, frightening, frustrating and confusing experience. These online functions directly affect MACON's in-store experience, such that they are tied to and provide a benefit to MACON. Defendant has not provided its business information in any other digital format that is accessible for use by blind and visually impaired individuals using screen reader software.

25. Like many consumers, MACON accesses numerous websites at a time to compare offerings, prices, sales, discounts, events, and promotions. MACON may view several dozen websites to compare features, discounts, promotions, and prices.

26. MACON utilizes screen reader software that allows individuals who are visually disabled to communicate with websites. However, Defendant's

Website contains access barriers that prevent free and full use by visually disabled individuals using keyboards and available screen reader software.

27. On or about the following dates, MACON attempted to utilize Defendant's Website:

a. August 16, 2026;

b. August 27, 2026;

c. September 13, 2026;

d. October 01, 2026 and

e. October 19, 2026.

(hereinafter "MACON's Website Visits"). During MACON's Website Visits, MACON experienced substantial access barriers and, thus, was denied fair and equal access to same. MACON was attempting to browse the offerings and online offers to educate himself as to the offerings, sales, discounts, and promotions being offered, and with the intent of making a purchase through Defendant's Website or at Defendant's Principal Place of Business.

28. While notice to Defendant is not required, MACON sent a pre-suit communication on August 27, 2026. As such, Defendant was on notice and yet still has failed to correct the barriers to access on Defendant's Website.

29. Prior to initiating suit, but following the sending of the pre-suit communications, MACON has continued to attempt to utilize Defendant's Website

during MACON's Website Visits to browse and educate himself as to the offerings, sales, discounts, and online promotions, with the intent of making a purchase through Defendant's Website or at Defendant's Principal Place of Business.

30. However, Defendant's Website continues to contain access barriers that prevent free and full use by visually disabled individuals using keyboards and available screen reader software.

**VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT**

31. MACON adopts and re-alleges the allegations stated in paragraphs 1 through 30 above as if fully stated herein.

32. On July 26, 1990, Congress enacted the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq. Commercial enterprises were provided one and a half (1.5) years from the enactment of the statute to implement its requirements. The effective date of Title III of the ADA was January 26, 1992, or January 26, 1993, if Defendant(s) have ten (10) or fewer employees and gross receipts of $500,000.00 or less. *See* 42 U.S.C. § 12182; 28 C.F.R. § 36.508(a).

33. Congress found, among other things, that:

a. some 43,000,000 Americans have one or more physical or mental disabilities, and this number shall increase as the population continues to grow older;

b. historically, society has tended to isolate and segregate individuals with disabilities and, despite some improvements, such forms of discrimination against disabled individuals continue to be a pervasive social problem, requiring serious attention;

c. discrimination against disabled individuals persists in such critical areas as employment, housing, public accommodations, transportation, communication, recreation, institutionalization, health services, voting and access to public services and public facilities;

d. individuals with disabilities continually suffer forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, benefits, or other opportunities; and,

e. the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our country is justifiably famous, and costs

the United States billions of dollars in unnecessary expenses resulting from dependency and non-productivity.

42 U.S.C. § 12101(a)(1)-(3),(5) and (9).

34. Congress explicitly stated that the purpose of the ADA was to:

a. provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;

b. provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities; and

c. invoke the sweep of congressional authority, including the power to enforce the Fourteenth Amendment and to regulate commerce, in order to address the major areas of discrimination faced on a daily basis by people with disabilities.

42 U.S.C. § 12101(b)(1)(2) and (4).

35. Section 302(a) of Title III of the ADA, 42 U.S.C. § 12101 et seq., provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

36. "Congress passed the ADA in 1990 to fix a serious problem—namely, the seclusion of people with disabilities resulting in explicit and implicit discrimination. . . . The disabled population hoped that, as a result of the ADA, their lives would no longer be shaped by limited access and the inability to choose. . . . However, reality—a lack of compliance with the ADA and severe underenforcement of the statute—soon destroyed this hope."[1]

37. More than thirty years "after the passage of the ADA, numerous facilities are still not compliant, leaving the disabled population in a second-class citizenship limbo. Title III of the ADA allows both the U.S. Attorney General[2] and private individuals[3] to sue, but the rate at which [ ] the Attorney General [is] bringing suit seeking compliance is extremely low. The Department of Justice's Disability Section, tasked with ADA enforcement, is understaffed[.]"[4]

38. Thus, "private suits by necessity represent the main tool for ensuring compliance with Congress' intent in passing the ADA,"[5] most of which suits "are

[1] Kelly Johnson, *Testers Standing up for the Title III of the ADA*, 59 Cas. W. Res. L. Rev. 683, 684 (2009), http://scholarlycommons.law.case.edu/caselrev/vol59/iss3/6 (citing H.R. REP. No. 101-485, pt. 2, at 28-29 (1990); Elizabeth Keadle Markey, *The ADA's Last Stand?: Standing and the Americans with Disabilities Act*, 71 Fordham L. Rev. 185 (2002) (arguing for a more lenient standard for standing under the ADA); and Samuel R. Bagenstos, *The Perversity of Limited Civil Rights Remedies: The Case of "Abusive" ADA Litigation*, 54 UCLA L. Rev. 1, 3 (2006) (discussing the need for private enforcement in Title III)).
[2] 42 U.S.C. § 12188(b).
[3] 42 U.S.C. § 12188(a).
[4] Johnson, *supra* note 1.
[5] *Betancourt v. Ingram Park Mall*, 735 F. Supp. 2d 587, 596 (W.D. Tex. 2010).

brought by a small number of private plaintiffs who view themselves as champions of the disabled."[6]

39. The U.S. Department of Justice ("DOJ") supports this dynamic, recognizing that because it "cannot investigate every place of public accommodation," "[p]rivate plaintiffs play an important role in enforcing the ADA[.]"[7]

40. Consistent with these policies, MACON files this case to ensure Defendant provides full and equal access to the goods and services that Defendant offers to the public from Defendant's Principal Place of Business and/or physical facilities.

41. Defendant's Principal Place of Business and Defendant's Website are public accommodations within the definition of Title III of the ADA, 42 U.S.C. § 12181(7).

42. There is a physical nexus between Defendant's Website and Defendant's Principal Place of Business in that Defendant's Website provides the contact information, physical address, operating hours, and access to products found at Defendant's Principal Place of Business. Defendant's Website acts as the

---

[6] *Id.* (*quoting Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1062 (9th Cir. 2007)); *D'Lil v. Best Western Encina Lodge & Suites*, 538 F.3d 1031, 1040 (9th Cir. 2008).

[7] Statement of Interest of the United States of America, *ERC v. Abercrombie & Fitch Co.*, No. 1:09-cv-03157 (D. Md.), ECF No. 38, at *1 (July 6, 2010); *See also Hensley v. Eckerhart*, 461 U.S. 424, 445 (1983) ("All of these civil rights laws depend heavily upon private enforcement, and fee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain.").

digital extension of Defendant's Principal Place of Business. The opportunity to shop and pre-shop Defendant's food and beverage offerings, review menus and specials, make dining reservations, reserve golf and multisport game simulators, review simulator pricing and party packages, and sign up for email updates and specials from home are important accommodations for MACON because traveling outside of his home as a visually disabled individual is often a difficult, hazardous, frightening, frustrating, and confusing experience. These online functions directly affect MACON's in-store experience, such that they are tied to and provide a benefit to MACON. Defendant has not provided its business information in any other digital format that is accessible for use by blind and visually impaired individuals using screen reader software.

43. Public accommodations under the ADA must ensure that their places of public accommodation provide effective communication for all members of the general public, including individuals with visual disabilities such as Plaintiff.

44. The broad mandate of the ADA is to provide equal opportunity for individuals with disabilities to participate in and benefit from all aspects of American civic and economic life. That mandate extends to internet e-commerce websites such as the Defendant's Website.

45. Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities the opportunity to participate in

or benefit from the goods, services, facilities, privileges, advantages or accommodations of an entity. 42 U.S.C. § 12182(b)(1)(A)(i).

46. Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities an opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages or accommodations, which is equal to the opportunities afforded to other individuals. 42 U.S.C. §12182(b)(1)(A)(ii).

47. Under Section 302(b)(2) of Title III of the ADA, unlawful discrimination also includes, among other things: "a failure to make reasonable modifications in policies, practices or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodations; and a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage or accommodation being offered or

would result in an undue burden." 42 U.S.C. § 12182(b)(2)(A)(ii)-(iii); see also 28 C.F.R. § 36.303(a).

48. According to 28 C.F.R. §36.303(b)(1), auxiliary aids and services include "voice, text, and video-based telecommunications products and systems". Indeed, 28 C.F.R. §36.303(b)(2) specifically states that screen reader software is an effective method of making visually delivered material available to individuals who are blind or have low vision.

49. Title III requires that "[a] public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c)(1). The regulation sets forth numerous examples of "auxiliary aids and services," including "...accessible electronic and information technology; or other effective methods of making visually delivered materials available to individuals who are blind or have low vision." 28 C.F.R. § 36.303(b). The acts alleged herein constitute violations of Title III of the ADA, and the regulations promulgated thereunder. MACON, who is blind and has disabilities that substantially limit the major life activity of seeing within the meaning of 42 U.S.C. §§ 12102(1)(A) and (2)(A), has been denied full and equal access to Defendant's Website because of his disability. He has not been provided services that are provided to other patrons who are not disabled, and/or has been provided services that are inferior to the services provided to non-disabled

persons. Defendant has failed to take the required prompt and equitable steps to remedy its discriminatory conduct. These violations are ongoing.

50. MACON encountered barriers on each of MACON's Website Visits. MACON attempted to access and/or utilize Defendant's Website, but was unable to, and he continues to be unable to enjoy full and equal access to Defendant's Website and/or understand the content therein because numerous portions of Defendant's Website do not interface with MACON's screen reader software. Specifically, features of Defendant's Website are inaccessible to MACON's screen reader software, including, but not limited to, the following (citing the WCAG 2.1 Level A and AA Guidelines and Conformance Levels):

**a. Missing List Markup for Navigation Links**

i. **Issue:** The navigation links are coded as plain links or div/span elements placed adjacent to one another without being wrapped in a proper list structure using and elements. Screen reader users rely on list markup to determine how many links are contained within a navigation group and to understand their position within that group. Without this semantic structure, screen readers cannot announce the group or item count, leaving users without the contextual

information needed to understand the size and organization of the navigation.




ii. **WCAG 2.1 AA Violations:** 1.3.1 - A - Info And Relationships

iii. **Impact:** For users who are blind and rely on screen readers, the absence of proper list markup means navigation links are presented without any structural context. Screen readers cannot announce the number of items in the group or the user's position within it, making it impossible to understand the scope and layout of the navigation. These users are denied the same navigational awareness that sighted users receive visually, creating a significant barrier to independent and efficient use of the site. Navigation links should be grouped within a proper list using , , and elements, and the list should carry a clear accessible label

such as aria-label="Main navigation" so that screen reader users know both the purpose and the contents of the navigation group.

**b. Incorrect Alt Text with HTML Entity Encoding**

i. **Issue:** The image logo link contains alt text encoded as "Smith's American Tavern | Lakeland, Florida Restaurant" rather than the correctly rendered text "Smith's American Tavern | Lakeland, Florida Restaurant." The raw HTML entity code """ has not been decoded, meaning screen readers may announce the literal character sequence ";#39;" in place of the apostrophe. This results in broken, meaningless output that prevents screen reader users from identifying the actual name of the business through the logo link.



ii. **WCAG 2.1 AA Violations:** 1.1.1 - A, 2.4.4 - A - Non Text Content

iii. **Impact:** For users who are blind and depend on screen readers to interpret image content, encountering raw HTML entity code in alt text renders the business name unintelligible. Instead of hearing "Smith's American Tavern," these users may hear a garbled string of characters that conveys no meaningful information. This prevents blind users from identifying the brand, understanding the purpose of the logo link, or confirming they are on the correct website. The alt text must contain the actual apostrophe character so that the accessible name of the logo link matches the real business name exactly as it would be read and understood.

**c. Missing New Window Indication for the Find and Directions Link**

i. **Issue:** The Find and Directions link opens a new browser window or tab without providing any prior notification to the user. Users who rely on screen readers or keyboard

navigation cannot visually detect that a new window has opened, and may be unaware that they have left the current page context. This unexpected change of context may cause users to believe the back button is non-functional, leaving them disoriented and unable to confidently return to their original task.




ii. **WCAG 2.1 AA Violations:** 2.4.4 - A, 3.2.2 - A - Link Purpose In Context

iii. **Impact:** For users who are blind and navigate using screen readers, an unannounced new window is particularly disorienting, as there is no visual cue to signal that the browsing context has changed. These users may not realize a new window has opened, may lose track of their place on the original page, and may be unable to return using standard back controls. This unexpected context change

constitutes a serious barrier to independent navigation. The link text or accessible name must clearly communicate that activating the link will open a new window, whether through visible text, an icon with appropriate alt text, or a screen-reader-only notice embedded within the link itself, so that users are informed before the action is taken.

**d. Missing New Window Indication for Get Directions Link**

i. **Issue:** The "Get Directions" link opens a new browser window or tab without providing any advance notice to the user. Keyboard and screen reader users cannot readily detect that a new window has opened and are therefore unable to return to the previous page using standard back navigation controls. This abrupt and unannounced change of context leaves users without the information needed to understand their current location within the site.




ii. **WCAG 2.1 AA Violations:** 2.4.4 - A, 3.2.2 - A - Link Purpose In Context

iii. **Impact:** For users who are blind and rely on screen readers, an unannounced new window represents a significant and disorienting barrier. Without visual indicators to signal a context change, these users may not realize a new window has launched, may lose their place on the original page, and may be unable to navigate back using familiar controls. This creates a breakdown in the user's ability to maintain orientation and control during navigation. The link must clearly indicate, both visually and programmatically, that activating it will open a new window or tab, through visible text, an icon with an accessible name, or an ARIA label. This information must be

conveyed to screen reader users before the link is activated, not after.

**e. Missing New Window Indication for the Cohesive Brands Link**

i. **Issue:** The "Cohesive Brands" link opens in a new browser window or tab without providing any prior notification to the user. When a new window opens without warning, users who rely on screen readers or who have cognitive disabilities are unable to understand what has changed or how to return to the previous page. This unexpected change of context creates a barrier that prevents smooth, predictable, and independent use of the page.




ii. **WCAG 2.1 AA Violations:** 2.4.4 - A, 3.2.2 - A - Link Purpose In Context

iii. **Impact:** For users who are blind and navigate using screen readers, an unannounced new browser window is particularly harmful, as there is no visual change to signal that the context has shifted. These users may not realize they have left the original page, may be unable to locate the previous content, and may find standard back navigation non-functional within the new window. This constitutes a serious obstacle to autonomous and confident use of the site. Any link that opens a new window or tab must inform the user of this behavior before activation, through visible text, an icon with an accessible label, or a screen-reader-only notice. This warning must be placed within the link element itself so that it is announced together with the link text at the moment of focus.

**f. Missing Visual Labels for the Reservation Combo Boxes**

i. **Issue:** The date, time, and party size combo boxes within the "Make a Reservation" widget lack visible text labels. Users are presented only with icons and pre-selected values such as "Aug 24, 2026" or "2 people," with no contextual indication of what each field represents. Without visible

labels, users—particularly those relying on screen readers or those with cognitive or visual disabilities—cannot determine what information each field is requesting.




ii. **WCAG 2.1 AA Violations:** 3.3.2 - A - Labels Or Instructions

iii. **Impact:** Users who are blind or have visual or cognitive disabilities are unable to identify the purpose of each combo box, as no visible or programmatically associated label is provided. Without labels such as "Date," "Time," or "Party Size" linked to their respective fields via "for" and "id" attributes or "aria-label," screen reader users will not hear the correct field name upon focus, making it impossible to complete the reservation process independently and accurately.

**g. Missing Visible Label on Email Field**

i. **Issue:** The email address field does not have a persistent visible text label. Users who rely on screen magnification, low vision aids, or screen readers are unable to identify the purpose of the field once placeholder text disappears upon interaction or is not announced correctly by assistive technology. This absence of a visible label prevents many users from completing the form accurately.




ii. **WCAG 2.1 AA Violations:** 3.3.2 - A - Labels Or Instructions

iii. **Impact:** Users who are blind or have low vision are unable to reliably identify the purpose of the email field, as placeholder text alone is insufficient and disappears upon input. Without a visible label that is persistently displayed and programmatically linked to the field via "for" and "id" attributes or by wrapping the input within a label element,

screen readers cannot announce the field name correctly, leaving blind users unable to complete the form independently or with confidence.

### h. Decorative Images Are Exposed to Screen Readers

i. **Issue:** Decorative images throughout the page have not been marked as decorative, causing screen readers to announce them to users. This introduces unnecessary auditory noise, making it impossible for screen reader users to distinguish between images that convey meaningful content and those that serve a purely visual or aesthetic purpose. When numerous decorative images are read aloud in sequence, navigating the page in a coherent and efficient manner becomes severely impaired.



ii. **WCAG 2.1 AA Violations:** 1.1.1 - A - Non Text Content

iii. **Impact:** Users who are blind and rely on screen readers are subjected to a disorganized and cluttered listening experience, as decorative images are announced alongside meaningful content without distinction. This makes it extremely difficult to navigate the page efficiently or locate relevant information. Decorative images must be hidden from assistive technology using an empty alt attribute, aria-hidden, or role="presentation" so that blind users can focus exclusively on content that is meaningful and actionable.

**i. Missing New Window Indication for "Lakeland, Florida 33801" Link**

i. **Issue:** The link labeled "Lakeland, Florida 33801" opens a new browser window or tab without providing any prior notification to the user. Screen reader users and keyboard-only users receive no indication that the page context will change upon activation. This absence of warning causes disorientation, as the new window opens without any announcement or visual cue to explain what has occurred.




ii. **WCAG 2.1 AA Violations:** 2.4.4 - A, 3.2.2 - A - Link Purpose In Context

iii. **Impact:** Users who are blind and rely on screen readers are particularly vulnerable to disorientation when a new browser window opens without warning, as they lose their navigational context with no explanation. The sudden shift in focus to a new window—without any textual or programmatic indication such as "opens in a new window"—makes it impossible for blind users to anticipate or manage the change in context, undermining their ability to navigate the page independently and safely.

**j. Image Used for Text Content**

i. **Issue:** The page renders text content through images rather than actual HTML text. Users who rely on screen readers are unable to access the text embedded within these images,

as it is not exposed to assistive technology. Additionally, text presented as images cannot be resized or visually adjusted by users who require larger or modified text, creating a significant barrier to reading and comprehending the content in an accessible and flexible manner.




ii. **WCAG 2.1 AA Violations:** 1.4.5 - AA, 1.1.1 - A - Images Of Text

iii. **Impact:** Users who are blind and depend on screen readers are entirely unable to access text that is embedded within images, as assistive technology cannot interpret visual text content. Furthermore, users with low vision who require text resizing or custom styling are prevented from adjusting the content to meet their needs. This renders critical information completely inaccessible to blind users and

severely limits usability for those with low vision, unless real HTML text is used in place of images of text.

**k. Incorrect Heading Level Used for Section Headings**

i. **Issue:** The headings "Find us downtown," "View our menus," and "Reserve a game simulator" are incorrectly marked up as h3 elements when they should be designated as h2 elements. This incorrect heading hierarchy disrupts the logical structure of the page, preventing screen reader users from accurately understanding the content hierarchy and locating these sections in the expected navigational order.




ii. **WCAG 2.1 AA Violations:** 1.3.1 - A - Info And Relationships

iii. **Impact:** For users who are blind or have visual disabilities and rely on screen readers to navigate by heading levels, the misuse of h3 elements in place of h2 elements makes it impossible to identify and access these primary sections in their correct hierarchical order. Each of these headings represents a main section of the page and should be designated with the h2 tag, ensuring heading levels progress sequentially from h1 without skipping levels. Without this correction, screen reader users are unable to use heading shortcuts to efficiently navigate the page or determine which sections carry equal structural importance, resulting in a severely degraded and disorienting browsing experience.

**l. Missing Heading Markup for "Hours" Text**

i. **Issue:** The text "Hours" is presented visually in a manner consistent with a heading, yet it lacks the appropriate semantic heading markup, such as an h2 or h3 tag. This absence of proper heading structure means that screen reader users who navigate by headings are entirely unable

to locate or identify the business hours section within the page, as it is invisible to heading-based navigation.




ii. **WCAG 2.1 AA Violations:** 1.3.1 - A - Info And Relationships

iii. **Impact:** For users who are blind and depend on screen readers to navigate page content through heading shortcuts, the absence of a proper heading tag on the "Hours" text renders this section completely inaccessible via heading navigation. These users have no means of jumping directly to the business hours information, forcing them to manually traverse the entire page to locate content that sighted users can immediately identify at a glance. The "Hours" text must be wrapped in a semantic heading tag that accurately reflects its hierarchical level within the page structure, and the heading label should remain concise and descriptive so

that users can clearly understand what content follows upon navigation.

51. Defendant’s Website was subsequently visited by Plaintiff’s expert, Till Paris, on or about August 22, 2026, and who confirmed the access barriers that MACON had initially encountered did, in fact, exist. The numerous access barriers found on Defendant’s Website by Plaintiff’s Expert are set forth in the Declaration of Till Paris, attached hereto as “Composite Exhibit 1”. The contents of “Composite Exhibit 1” are incorporated herein by reference. These access barriers continue to render Defendant’s Website inaccessible to users who are blind and visually disabled, including MACON.

52. More violations may be present on Defendant’s Website, which can and will be determined and proven through the discovery process in this case.

53. There are readily available, well-established guidelines on the internet for making websites accessible to the blind and visually disabled. These guidelines have been followed by other large business entities in making their websites accessible. Incorporating such basic components to make the Defendant's Website accessible would neither fundamentally alter the nature of Defendant’s business nor would it result in an undue burden to the Defendant.

54. Defendant thus has failed to make reasonable modifications in its policies, practices, or procedures when such modifications are necessary to afford

goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, in violation of 28 C.F.R. §36.302.

55. To the best of Plaintiff's belief and knowledge, Defendant has failed to eliminate the specific violations set forth in paragraphs 50 and 51 herein. As a result, Defendant has violated the ADA -- and continues to violate the ADA -- by denying access to Defendant's Website by individuals, such as MACON, with visual disabilities who require the assistance of interface with screen reader software to comprehend and access internet websites. These violations within the Defendant's Website are ongoing.

56. Although Defendant is charged with having knowledge of the violations, Defendant may not have actual knowledge of said violations until this Complaint makes Defendant aware of same.

57. Here, however, MACON, through counsel, did send a pre-suit communication informing Defendant of the barriers to access on August 27, 2026. As such, Defendant was on notice and yet still has failed to correct the barriers to access on Defendant's Website.

58. As a direct and proximate result of Defendant's failure to provide an ADA compliant Website, with a nexus to Defendant's Principal Place of Business, Plaintiff has suffered an injury in fact by being denied full access to and enjoyment of Defendant's Website and Defendant's Principal Place of Business.

59. Because of the inadequate development and administration of the Defendant's Website, MACON is entitled to injunctive relief pursuant to 42 U.S.C. §12133 and 28 C.F.R. §36.303, to remedy the ongoing disability discrimination.

60. Enforcement of MACON's rights under the ADA is right and just pursuant to 28 U.S.C. §§2201 and 2202.

61. MACON has retained the undersigned counsel for the pursuit, filing and prosecution of this action. MACON is entitled to have his reasonable attorneys' fees, costs and expenses paid by Defendant, pursuant to 42 U.S.C. § 12205 and 28 CFR § 36.505.

62. Pursuant to 42 U.S.C. §12188, this Court is vested with the authority to grant MACON appropriate and necessary injunctive relief; including an order to:

a. Require Defendant to adopt and implement a web accessibility policy to make publicly available and directly link from the homepage of Defendant's Website to a statement as to the Defendant's policy to ensure persons with disabilities have full and equal enjoyment of the services, facilities, privileges, advantages, and accommodations through Defendant's Website.

b. Require Defendant to take the necessary steps to make Defendant's Website readily accessible to and usable by visually

disabled users, and during that time period prior to Defendant's Website's being readily accessible, to provide an alternative method for individuals with visual disabilities to access the information available on Defendant's Website until such time that the requisite modifications are made, and

c. Require Defendant to provide the appropriate auxiliary aids such that individuals with visual impairments will be able to effectively communicate with Defendant's Website for purposes of viewing and locating Defendant's Principal Place of Business, and becoming informed of and purchasing Defendant's offerings online, and during that time period prior to Defendant's Website's being designed to permit individuals with visual disabilities to effectively communicate, to provide an alternative method for individuals with visual disabilities to effectively communicate for such goods and services made available to the general public through Defendant's Website.

WHEREFORE, MACON requests entry of judgment in his favor and against Defendant for the following relief:

A. A declaration that Defendant's Website is in violation of the ADA;

B. An Order requiring Defendant, by a date certain, to update Defendant's Website, and continue to monitor and update Defendant's Website on an ongoing basis, to remove barriers in order that individuals with visual disabilities can access, and continue to access, Defendant's Website and effectively communicate with Defendant's Website to the full extent required by Title III of the ADA;

C. An Order requiring Defendant, by a date certain, to clearly display the universal disabled logo within Defendant's Website, wherein the logo would lead to a page which would state Defendant's accessibility information, facts, policies, and accommodations. Such a clear display of the disabled logo is to ensure that individuals who are disabled are aware of the availability of the accessible features of Defendant's Website;

D. An Order requiring Defendant, by a date certain, to provide ongoing support for web accessibility by implementing a website accessibility coordinator, a website application accessibility policy, and providing for website accessibility feedback to ensure compliance thereto;

E. An Order directing Defendant, by a date certain, to evaluate its policies, practices and procedures toward persons with disabilities, for

such reasonable time to allow Defendant to undertake and complete corrective procedures to Defendant's Website;

F. An Order directing Defendant, by a date certain, to establish a policy of web accessibility and accessibility features for Defendant's Website to ensure effective communication for individuals who are visually disabled;

G. An Order requiring, by a date certain, that any third-party vendors who participate on Defendant's Website to be fully accessible to the visually disabled;

H. An Order directing Defendant, by a date certain and at least once yearly thereafter, to provide mandatory web accessibility training to all employees who write or develop programs or code for, or who publish final content to, Defendant's Website on how to conform all web content and services with ADA accessibility requirements and applicable accessibility guidelines;

I. An Order directing Defendant, by a date certain and at least once every three months thereafter, to conduct automated accessibility tests of Defendant's Website to identify any instances where Defendant's Website is no longer in conformance with the accessibility requirements of the ADA and any applicable accessibility guidelines,

and further directing Defendant to send a copy of the twelve (12) quarterly reports to Plaintiff's counsel for review;

J. An Order directing Defendant, by a date certain, to make publicly available and directly link from Defendant's Website's homepage, a statement of Defendant's Accessibility Policy to ensure the persons with disabilities have full and equal enjoyment of Defendant's Website and shall accompany the public policy statement with an accessible means of submitting accessibility questions and problems;

K. An award to Plaintiff of his reasonable attorney's fees, costs, and expenses; and

L. Such other and further relief as the Court deems just and equitable.

**<u>Certification Under Penalty of Perjury That Artificial Intelligence Was Used in the Preparation of This Filing</u>**

I have reviewed the Standing Order Requiring Disclosure of the use of artificial intelligence. Artificial intelligence was used in the preparation of this filing in the following way: The firm's case-management software uses AI to populate documents with case-specific information from the firm's records, creating a preliminary draft. Before filing, the signing attorney independently verifies that information against the underlying records, makes any necessary revisions, and reviews and finalizes the document. This automated population process does not perform legal research or generate case citations. The attorney then continues working on the document, reviewing all initial entries, and finalizing it before filing. The Case Management Software input does not involve legal research or case citations. However, under penalty of perjury, I certify that before filing, I personally reviewed Rule 11 of the Federal Rules of Civil Procedure and I personally read every case. I understand that if a case upon which I rely does not exist or does not reasonably stand for the cited proposition, the Court may treat this as a violation of Rule 11 of the Federal Rules of Civil Procedure. I have reviewed Rule 11 of the Federal Rules of Civil Procedure and I understand that this rule applies equally to counsel and unrepresented parties, that as the person signing this filing I am the person who will be held responsible for its

contents even if it was prepared by someone else, and I am familiar with the sanctions available for violations of Rule 11. If this certification is made by counsel, I further understand that citation to a case that either does not exist or does not reasonably stand for the cited proposition may be treated as a violation of my oath of candor toward the tribunal and a basis on which my admission to practice in the Middle District of Florida could be revoked or suspended. Further, whether I represent myself or I am an attorney representing a client, I understand that by making this certification under penalty of perjury, I could be referred for criminal prosecution if the statements I make here are false.

Dated: October 30, 2026

Respectfully submitted,

**ADA LEGAL TEAM, LLC**
300 Avenue of the Champions, Suite 260
Palm Beach Gardens, FL 33418
Phone: (561) 227-9821
Facsimile: (561) 491-9459

By: **/s/ Gregory S. Sconzo**
GREGORY S. SCONZO, ESQUIRE
Florida Bar No.: 0105553
**DESIGNATED LEAD COUNSEL**
**Primary Email:** greg@sconzolawoffice.com
**Secondary Email**: greg@adalegalteam.com
**Secondary Email**: kevin@adalegalteam.com
**Attorney for Plaintiff**